UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

ROBERTA FOWLER,                                    :

                  Plaintiff,                      :          06-CV-4351 (NRB)

-against-                                          :

VNS CHOICE COMMUNITY CARE and                      :
JANE LANDERS,
                                                   :

                  Defendants.                     :

-------------------------------------------------------------x

## DEFENDANTS' RULE 56.1 STATEMENT OF MATERIAL FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 56.1, defendants VNS CHOICE Community Care ("VNS") and Jane Landers respectfully submit that the following material facts are not in dispute, for purposes of this Summary Judgment Motion.

### Parties and Case History

1.      VNS is a certified home health agency that provides long-term care for frail, older adults who wish to remain in their homes as long as possible but require ongoing assistance. (Landers Dep. at 5).

2.      In March 2004 and again in November 2004, Landers, plaintiff's supervisor, advised plaintiff that VNS was changing and eliminating her position in the near future. (Fowler Dep. at 128, 130). On March 22, 2005 VNS informed plaintiff that due to her position elimination, her employment would be terminated. (Fowler Dep. at 140).

3.      Plaintiff's position was terminated effective April 1, 2005. (Fowler Dep. at 142).

4.      Following her job elimination, plaintiff filed a charge with the New York State Division of Human Rights (the "NYSDHR") on August 9, 2005.

5.     In or about March 2006, VNS received a Right to Sue Letter regarding plaintiff's claims. (Fowler Dep. at 150-51; Exhibit 6).[1]

6.     On June 9, 2006, plaintiff brought this action against VNS and Jane Landers. Plaintiff amended her complaint on July 26, 2006. (Exhibit 7).

7.     On June 30, 2006, the NYSDHR issued a decision dismissing plaintiff's charge, stating that "there is NO PROBABLE CAUSE to believe that the respondent [VNS] has engaged in or is engaging in the unlawful discriminatory practice complained of". (Fowler Dep. at 150; Exhibit 5).

8.     On September 9, 2006, after defendants requested a pre-motion conference with the Court to discuss moving for Rule 11 sanctions, plaintiff withdrew her intentional infliction of emotional distress claim.

9.     Plaintiff asserts that defendants discriminated against her on the basis of her race and national origin as a "Southern African American". (Fowler Dep. at 41-42, 45-46, 71; Exhibit 7 ¶¶ 19, 21). In support of her national origin claim, plaintiff alleges that VNS and Landers eliminated her position and treated her differently because she is from North Carolina and has a southern accent. (Fowler Dep. at 45-46, 71).

***Background***

10.     Plaintiff was hired in January 2003 as a Program Assistant with the VNS Bronx office, after a successful interview with defendant Landers, who would be her supervisor. (Fowler Dep. at 16-18; Landers Dep. at 7).

11.     In this interview, plaintiff volunteered to Landers that she was born and reared in the southern region of the United States, specifically North Carolina; thus, when Landers made

---

[1] Referenced exhibits and deposition testimony are annexed to the Affirmation of Tonianne Florentino.

the recommendation to hire plaintiff, she did so with full knowledge of plaintiff's race and "national" origin. (Fowler Dep. at 87).

12.     Plaintiff found the hiring process to be completely fair and non-discriminatory. (Fowler Dep. at 17-18, 23).

13.     Plaintiff's Program Assistant position encompassed a variety of clerical responsibilities, including: working with team managers, performing administrative/clerical work on a day to day basis, working "hand in hand" with nurses, copying mail distribution and time cards, escort coordination, managing data entry, report analysis, managing and tracking cell phones and beepers for field staff (as well as troubleshooting those phones), acting as the PeopleSoft Liaison and managing and tracking HIPAA training. (Fowler Dep. at 18-20, 224-28, 317; Landers Dep. at 13-15).

14.     Plaintiff received thorough training for all of her job responsibilities. (Fowler Dep. at 20-22). This included PeopleSoft training, HIPAA training and on the job training from co-workers. (Fowler Dep. at 21-22, 114, 317).

15.     Plaintiff found her training process to be completely fair and non-discriminatory. (Fowler Dep. at 17-18, 23).

16.·     From January 2003 to September 2003, plaintiff does not believe she was treated unfairly or discriminated against in any aspect of her employment. (Fowler Dep. at 23-24).

17.     Plaintiff worked with a diverse group of employees including many Black (African-American and West Indian) and Hispanic employees. (Fowler Dep. at 44-45, 49-50, 94-96, 121-24).

18.     Plaintiff believes Landers treated these employees fairly because "she [Landers] never carried on with them the way she did with me". (Fowler Dep. at 233).

19.     Landers hired or promoted many of these employees, including Simone Scott and French Anderson, both of whom are Black.  (Fowler Dep. at 49-50, 57-58, 94-95).   Plaintiff classified French Anderson as a Black West Indian (Fowler Dep. at 94-95) and Simone Scott as a northern African-American (Fowler Dep. at 47-49).

20.     Landers also treated "northern African-American" employees fairly because they were northern blacks and had northern accents.  (Fowler Dep. at 46-50).   Plaintiff classifies Geneva Shields, who was born in the south, as a northern African-American because she spent more time in the north than did plaintiff.  (Fowler Dep. at 48).  Plaintiff classifies Simone Scott as a northern African-American because she has "more of a northern accent".  (Fowler Dep. at 48).

*Assignments/Responsibilities Given to Plaintiff*

21.     Landers did not initially assign plaintiff all of the clerical duties she was expected to perform as a Program Assistant; rather, Landers gradually increased plaintiff's responsibilities as plaintiff completed her training and accumulated more experience.  (Fowler Dep. at 224-27).

22.     At the beginning of her employment, plaintiff was in charge of assigning and troubleshooting cell phones, monitoring and troubleshooting the copy machine, and tracking monthly reports.  (Fowler Dep. at 224-27).  Although this was a critical aspect of her job duties, plaintiff characterized it as "Dealing with the nurses you had to wait on their hand [sic] every day."  (Fowler Dep. at 132).

23.     In the middle of 2003, plaintiff became responsible for copying time cards (and overtime cards) and forwarding them to the proper person.  (Fowler Dep. at 224-25).

24.     In the latter portion of 2003, plaintiff was responsible for entering the dates employees received HIPAA and fire prevention training into the company database.  (Fowler Dep. at 227-28).

25.     Finally, in 2004, plaintiff's responsibilities included recording and copying incident reports filed with team managers, Interruption of Care ("IOC") data entry work, and full responsibility for assigning and scheduling escorts and translators.  (Fowler Dep. at 226-32).

26.     All of the responsibilities assigned to plaintiff were part of her duties as Program Assistant.  (Landers Dep. at 13-16; Landers Aff. ¶ 5 and Exhibit B attached thereto; Exhibit 1; Exhibit 4).

27.     Plaintiff was instructed to delegate some of her responsibilities, although she resisted doing so. (Fowler Dep. at 132-33, 228-29; Exhibit 1).

28.     Plaintiff did not believe she was assigned too much work, and she enjoyed her work. (Fowler Dep. at 133).

### October 2003 Incident Between Plaintiff and Landers

29.     In October 2003, plaintiff was assigned to reprogram the telephones to ensure overnight coverage. (Fowler Dep. at 24, 27; Landers Dep. at 50).

30.     On October 21, 2003, Landers learned that a problem had occurred with the telephone reprogramming, resulting in disrupted service to VNS patients.  (Fowler Dep. at 27-29; Landers Dep. at 51).

31.     That day, Landers confronted plaintiff about the extent to which plaintiff might have been responsible for the problem. (Fowler Dep. at 28-29; Landers Dep. at 51-52).  Plaintiff shouted at Landers.  (Fowler Dep. at 28-29, 36; Landers Dep. at 52).

32.     After plaintiff told Landers that she was resigning, Landers apologized for the incident, hugged plaintiff and asked her to stay. (Fowler Dep. at 34-36). Plaintiff's colleagues told her that Landers got upset from time to time and said that plaintiff should just stay and do her job. (Fowler Dep. at 30-31).

33.     Plaintiff believed that she and Landers had resolved any issues between them (Fowler Dep. at 36), and no major incidents occurred between plaintiff and Landers for the following year. (Fowler Dep. at 54-55).

*Plaintiff's 2003 Performance Appraisal*

34.     In March 2004, plaintiff received her performance appraisal for calendar year 2003. (Fowler Dep. at 102-03, 108).

35.     In the 2003 appraisal, Landers rated plaintiff as "exceeds expectations", the highest possible rating, for the work she did coordinating the move to the department's new office. (Fowler Dep. at 109; Exhibit 1).

36.     In the same appraisal, Landers also outlined the serious concerns she had with plaintiff's communication skills and time management. (Fowler Dep. at 108; Exhibit 1). Specifically, Landers stated that plaintiff "needs to become more self-directing and show more initiative with problem solving, priority setting, and timely completion of tasks" and "needs to take inventory of her work activities/responsibilities to determine which tasks can be delegated to the escorts and the office clerk." (Exhibit 1). Regarding plaintiff's communication skills, Landers specifically noted that "Roberta is aware that these limitations currently affect certain aspects of her job responsibilities but that they also limit her opportunities for advancement." (Exhibit 1).

37.     Plaintiff and Landers agreed on most aspects of her evaluation. (Fowler Dep. at 103). Specifically, plaintiff agreed with Landers that she should receive a rating of "Needs Development" in the following General Competencies: "Accountable/Results-Oriented," "Business Acumen," "Communications (written and oral)," "Initiative/Innovation," and "Planning and Problem Solving" and plaintiff agreed to take workshops in business writing, grammar skills, and time management. (Exhibit 1; Fowler Dep. at 108).

38.     Plaintiff believes that there was nothing unfair or discriminatory about her 2003 performance evaluation. (Fowler Dep. at 103-04).

39.     Plaintiff and Landers had a "very pleasant" meeting to discuss plaintiff's 2003 performance evaluation. (Fowler Dep. at 103). During this meeting, Landers established a performance improvement plan for plaintiff. (Fowler Dep. at 128). Landers advised plaintiff that if she wanted to maintain her employment with VNS, she had to focus on the many job performance areas that needed improvement. (Fowler Dep. at 128).

40.     Landers recommended that plaintiff consider another position at VNS, the Member Services Representative ("MSR") position (Landers Dep. at 62, 70-71), but plaintiff declined because she believed the position had too much phone work. (*Id.* at 204-05).

***October 2004 Incident***

41.     On October 29, 2004, Landers asked plaintiff for data regarding the use of the Prevention & Screening Tool; however, plaintiff was unable to provide Landers with the requested data. (Fowler Dep. at 59-60; Landers Dep. at 52-53).

42.     When Landers asked why the data was not available, plaintiff blamed the nurses for entering the wrong Medical Record Number ("MRN") on a patient's document. (Fowler Dep. at 60-61). Although plaintiff knew the patient's name and realized that the MRN was

7

incorrect, she had not checked the MRN, had not asked the nurse to correct it, and could not explain how the mistake occurred. (Fowler Dep. at 60-61).

43.    When Landers began questioning plaintiff about each patient's Prevention & Screening Tool, plaintiff became very upset and agitated.   (Landers Dep. at 53).   She was "looking towards the Heavens" while Landers was speaking to her and telling Landers to "take her attitude home to her family". (Fowler Dep. at 75, 159).   Landers believed that plaintiff was rolling her eyes, and she reacted angrily to what she perceived as plaintiff's disrespectful response.  (Fowler Dep. at 63, 75, 84).

44.    Plaintiff yelled at Landers during this meeting.   (Fowler Dep. at 76).   In fact, when plaintiff was asked whether she yelled at Landers during their argument, plaintiff remarked "Like I told her, when you yells at me, I yells back." (Fowler Dep. at 76).

45.    While Landers was still speaking to her, plaintiff walked away from Landers (Fowler Dep. at 63, 66, 76-78) and slammed the door, which brushed Landers (Fowler Dep. at 70).

46.    When Landers told plaintiff that their conversation was not yet concluded and asked plaintiff to return to Landers's office, plaintiff made no response and did not return. (Fowler Dep. at 78).

47.    On February 9, 2005, plaintiff's journal entry included a statement, about Landers, which read "that bitch should get killed on her way home". (Fowler Dep. at 213).

*Plaintiff's Complaints to Human Resources*

48.    On November 3, 2004, plaintiff submitted a written complaint to Silvia Viciedo, the Human Resources manager for the area in which plaintiff worked. (Exhibit 2).

49.    Although plaintiff's complaint focused on Landers, the letter did not contain a single mention of race or national origin discrimination. (Exhibit 2).

50.    In response to plaintiff's complaint, as well as concerns Landers had expressed about plaintiff, Viciedo met with the two together on November 8, 2004. (Fowler Dep. at 125). During this meeting, Viciedo noted that, according to the documents produced by Landers in preparation for the meeting, plaintiff was not performing her job satisfactorily. (Fowler Dep. at 125). Landers also reminded plaintiff that VNS was eliminating the Program Assistant position, and because plaintiff's work was not "up to par", she was in danger of losing her employment with VNS. (Fowler Dep. at 128, 130).

51.    Despite the second notification that her job was changing and she should consider other employment, plaintiff took no steps to seek other employment within VNS. (Fowler Dep. at 204-05, 213; Landers Dep. at 62, 70-71).

52.    On November 15, 2004, plaintiff wrote a second letter to Viciedo (Exhibit 3), stating that she was not satisfied with the outcome of their meeting. (Fowler Dep. at 161; Exhibit 3).

53.    Plaintiff did not make any references to race or national origin discrimination. (Fowler Dep. at 164; Exhibit 3). Moreover, plaintiff offered no examples of allegedly discriminatory treatment by Landers or anyone else at VNS. (Exhibit 3).

54.    Plaintiff testified that she observed Landers yelling at employees outside plaintiff's protected classes including: Patricia Justice, who is Caucasian, Yolanda Phillipe, who is Dominican, and French Anderson, who is West Indian. (Fowler Dep. at 57, 93-95).

*Plaintiff's 2004 Performance Appraisal and Job Elimination*

55.    On March 22, 2005, Landers and Nelline Shaw, Clinical Director, met with plaintiff and reviewed with plaintiff her 2004 performance appraisal. (Fowler Dep. at 140).

56.    In this performance appraisal, plaintiff was rated as "Needs Development" in eight of nine "general competencies" (Exhibit 4).   Specifically, plaintiff received a "Needs Development" rating in the following competencies: "Accountable/Results Oriented"; "Adaptability/Flexibility"; "Business Acumen"; "Communications (written and oral)"; "Customer Focus"; "Initiative/Innovation"; "Interpersonal Effectiveness"; "Planning and Problem Solving"; and "Teamwork and Collaboration". (Exhibit 4).   The appraisal contained comments about how plaintiff had failed to improve in her communication, time management, or conflict management despite attending workshops in these areas. (Exhibit 4).

57.    Plaintiff also received a "Does Not Meet" rating in three of her five key job responsibilities: PSHR Liaison Responsibilities and PeopleSoft Administration (Job Responsibility #1); Data Entry and Preparing, Developing, and Maintaining Reports (Job Responsibility #2); and Coordination of Escort/Translators (Job Responsibility #5).  With respect to plaintiff's specific duties, Landers noted that "data entry and management of tracking…needed to be reassigned" (Job Responsibility #2); "Roberta has not shown evidence of the critical thinking that is necessary to manage this responsibility" (Job Responsibility #3); and that plaintiff's co-workers "resist asking [plaintiff] for help due to her negative response." (Supervisor Comments to Goal #2). (Exhibit 4).

58.    Landers and Shaw advised plaintiff that VNS had decided to eliminate the Program Assistant position in the Bronx region as it had done in its other regions. (Landers Dep.

at 61; Affidavit of Jane Landers ("Landers Aff.") ¶ 4).  The decision to eliminate this position was program-wide. (Landers Dep. at 61).

59.     The position was upgraded to an Administrative Coordinator position, a higher-level exempt position entailing more significant business services management responsibilities. (Landers Aff. ¶ 5 and Exhibit A attached thereto).

60.     Because the position that plaintiff had held was eliminated, VNS advised plaintiff that her employment was being terminated, effective April 1, 2005. (Fowler Dep. at 142).

61.     Plaintiff did not apply for the new Administrative Coordinator position. (Fowler Dep. at 213; Landers Aff. ¶ 6).

62.     Plaintiff was not qualified for the Administrative Coordinator position. (Fowler Dep. at 6, 14; Landers Dep. at 62).

63.     The Administrative Coordinator position required a college degree and business service management experience (Landers Aff. ¶ 5 and Exhibit A attached thereto), neither of which plaintiff had. (Fowler Dep. at 6, 14).

64.     Plaintiff's former position, Position Assistant, required only a high school diploma and clerical experience, and is largely clerical in nature. (Landers Aff. ¶ 5 and Exhibit B attached thereto).

65.     The Administrative Coordinator position focuses on the management of operational functions (Landers Aff. ¶ 5 and Exhibit A attached thereto), and the Administrative Coordinator oversees, coordinates, plans and organizes the day-to-day operations and administrative matters to support the goals and objectives of the department. (Landers Aff. ¶ 5 and Exhibit A attached thereto).

66.     The Administrative Coordinator is also responsible for the preparation and development of statistical reports and the coordination and management of confidential information as well as assisting the Department Head with the development and monitoring of the department budget and the preparation of correspondence, data, and drafting materials for presentations and reports. (Landers Aff. at ¶ 5 and Exhibit A attached thereto).

67.     The Administrative Coordinator position requires the ability to "multi-task in a fast-paced environment" (Landers Aff. ¶ 5 and Exhibit A attached thereto).

68.     Plaintiff complained about the volume and variety of work assigned to her in the Program Assistant position.  (Fowler Dep. at 132-34, 136-37; Exhibit 1; Exhibit 4).

69.     The Administrative Coordinator must also possess strong communication and interpersonal skills (Landers Aff. ¶ 5 and Exhibit A attached thereto), two areas in which plaintiff was rated as needing improvement.  (Fowler Dep. at 108; Exhibit 1; Exhibit 4)

70.     Following the elimination of plaintiff's position and before the hiring of a new Administrative Coordinator, Landers hired a temporary employee, Jinnell Brown, to perform the functions of the Administrative Coordinator.  (Landers Aff. ¶ 7).

71.     Brown, who is African American, is a college graduate who holds a Bachelor of Science degree from John Jay College.   (Landers Aff. ¶ 8 and Exhibit C attached thereto). Brown had prior experience in positions that were similar to the Administrative Coordinator position, and had also worked directly with high-level corporate officers.  (Landers Aff. ¶ 8 and Exhibit C attached thereto).

72.     While Brown was serving as the Acting Administrative Coordinator, she and Landers interacted very well, and VNS received no complaints from Brown regarding Landers or anyone else at VNS.  (Landers Aff. ¶ 9)

73.     Ultimately, VNS hired Olga Ortiz to be the new Administrative Coordinator in the Bronx region. (Landers Dep. at 63).

74.     Ortiz, a graduate of Lehman College, had five years of prior experience as a Business Manager for HHC-Health and Home Care and Director of Business Services at North Eastern Home Health Care Agency before beginning with VNS as Administrative Coordinator. (Landers Aff. ¶ 10 and Exhibit D attached thereto).

75.     In addition, Ortiz had previously worked for VNS from 1991 through 2000 and was highly regarded by her former managers.  (Landers Dep. at 63-64; Landers Aff. ¶ 10 and Exhibit D attached thereto).

76.     Ortiz has been in the position since June 2005, and is performing all job functions capably and without incident.  (Landers Aff. ¶ 11).

*Plaintiff's Discovery Abuse*

77.     At the conference held on October 16, 2006, the Court ordered the parties to exchange written discovery requests in the next few weeks, and to complete one deposition each [the depositions of plaintiff and Landers] before the next conference, scheduled for January 22, 2007.

78.     Accordingly, on October 31, 2006, defendants served plaintiff with their requests for documents.    (Exhibit 8).    Defendants' Document Request No. 24 sought "all documents...which relate directly or indirectly to the allegations in the Amended Complaint or the facts upon which plaintiff bases her claims." (Exhibit 8 ¶ 24).

79.     After receiving the document requests, plaintiff's counsel, Andrew Schatkin, forwarded the requests to plaintiff and instructed her to identify the responsive documents. (Fowler Dep. at 351, 362).

80.     Plaintiff only produced a fraction of the documents in her possession despite her belief that all such documents were responsive to defendants' requests. (*Id.* at 207, 280-81, 360).

81.     Plaintiff kept the remainder of responsive documents in a "carton" at her home, including four tape recordings of meetings between VNS managers and plaintiff (including plaintiff's termination meeting) (Fowler Dep. at 183-84, 326-27, 357) and a "whole bunch" of e-mails (Fowler Dep. at 207).

82.     Most of the documents in plaintiff's possession were documents containing confidential patient information that plaintiff had taken from VNS (Fowler Dep. at 290-91, 293, 296), against company policy (Fowler Dep. at 300-01, 309-11) and HIPAA requirements (Fowler Dep. at 317-20).

83.     Plaintiff also took home documents containing confidential VNS personnel information, against VNS policy. (Fowler Dep. at 110-11, 343-49; Landers Aff. ¶ 12 and Exhibit E attached thereto).

84.     Plaintiff was well aware of the sensitivity of these documents, and thus hid the documents in a room in her house which people rarely entered, and put the documents in a closet any time her son stayed with her. (Fowler Dep. at 292-94, 296).

85.     Plaintiff was also aware that VNS could terminate her for taking these documents home. (*Id.* at 309-11).

86.     After defendants learned in the initial deposition sessions (the January 12, 2007 and January 17, 2007 depositions) that plaintiff had failed to produce many relevant documents and defendants demanded immediate production of these documents in response to its October request, plaintiff delivered two audiotapes and a box of documents to defendant on January 22, 2007, just prior to the start of a preliminary conference with the Court. (Fowler Dep. at 280).

87.     After the conclusion of the conference, plaintiff told defense counsel that she (plaintiff) had additional documents at her home that she had not yet produced. (Fowler Dep. at 282-83).

88.     When asked why plaintiff had failed to produce all remaining responsive documents on that date (January 22), plaintiff replied that her attorney had told her that she "had too much information" and "I didn't need all of that" despite being aware that the documents were responsive and should be produced. (Fowler Dep. at 284).

89.     Plaintiff testified that she "explained [to] him [Schatkin] that the information I had was the work I was doing" and was therefore relevant to defendants' requests. (Fowler Dep. at 284).

90.     Finally, several days later, plaintiff produced the remaining documents in her possession. (Fowler Dep. at 284-85).

Dated: New York, New York
       May 31, 2007

                                        Respectfully submitted,

                                        COLLAZO CARLING & MISH LLP

                                 By:    _Tonianne Florentino_

                                        Tonianne Florentino (TF 9811)
                                        Attorneys for Defendants
                                        VNS CHOICE Community Care
                                        and Jane Landers
                                        747 Third Avenue
                                        New York, NY 10017-2803
                                        (212) 758-7600

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

ROBERTA FOWLER,                                            :

                                Plaintiff,                  :           06-CV-4351 (NRB)

-against-                                                  :           **AFFIRMATION OF SERVICE**

VNS COMMUNITY CARE and                                     :
JANE LANDERS,

                                                 :

                          Defendants.                 :

-----------------------------------------------------------------x

STATE OF NEW YORK    )
                           ) ss.:
COUNTY OF NEW YORK  )

I, TONIANNE FLORENTINO, being duly sworn, depose and say:

I am associated with the firm of Collazo Carling & Mish LLP, attorneys for Defendants

Visiting CHOICE Community Care and Jane Landers.

On May 31, 2007, I caused a true copy of Defendants' Statement of Undisputed Facts

pursuant to Local Rule 56.1 to be served by first-class mail upon Plaintiff's Counsel:

                         Andrew Schatkin, Esq.
                         Attorneys for Plaintiff
                         350 Jericho Turnpike
                         Jericho, New York 11753

TONIANNE FLORENTINO (TF 9811)